OPINION
{¶ 1} Rose Zellmer ("Zellmer") appeals from a judgment of the Greene County Court of Common Pleas, which ordered her to pay Ashbury Development and Realty Investments, Inc. a total of $108,975 plus interest due to her breach of an oral contract. Ashbury Development and Realty Investments cross-appeal from the judgment, which ordered them, jointly and severally, to pay Zellmer $270 plus interest pursuant to the same oral agreement and which ordered Ashbury Development to pay Zellmer a total of $65,843.49 pursuant to a contract for services.
 {¶ 2} In 1993, Ashbury Development was developing a subdivision in Fairborn, Ohio known as Ashbury Hill ("the subdivision"). It contracted with TAD Development, Inc. to develop the subdivision and with Realty Investments, Inc. to build homes in the subdivision. David A. Butler ("Butler") is the secretary of Ashbury Development and the president of Realty Investments and TAD Development.[1] At that time, Zellmer was an agent with ERA Dawson Realty and was doing marketing work for the subdivision pursuant to a marketing contract.
 {¶ 3} In the summer of 1993, Ashbury planned to build a house on Lot Number 7055 in the subdivision, which was to have the street address 1644 Wimbledon Drive. Ashbury, however, was unable to obtain financing and requested assistance from Zellmer. In an oral agreement, Zellmer agreed to obtain a loan for construction of a house at 1644 Wimbledon Drive, provided that she be reimbursed for all expenses associated with obtaining the loan, making mortgage payments, and constructing the house. Zellmer further agreed to market the house. For her marketing services, Zellmer would obtain a commission, but it was agreed that all profits from the endeavor would belong to Ashbury. To enable Zellmer to obtain a construction loan from NBD Mortgage Company ("NBD"), Ashbury executed a purchase contract and general warranty deed and transferred fee simple title to the property to Zellmer on August 7, 1993. There is some dispute regarding whether the loan officer at NBD was made aware of the parties' agreement.
 {¶ 4} Zellmer applied for the loan and paid an application fee of $270. On November 23, 1993, NBD issued a loan of $70,000 to Zellmer. As agreed, the money was used in the construction of a house at 1644 Wimbledon Drive. The project was completed in the fall of 1994, at a total cost exceeding $155,000. Zellmer was unable to find a buyer for the house initially, so Butler and his family lived in the home for a year. In the fall of 1995, a Mr. and Mrs. Kim purchased the property pursuant to a land installment contract executed on November 27, 1995. Pursuant to the land installment contract, the Kims were to purchase the property for $169,900. They were to make a $20,000 down payment and monthly payments of $1,206.95 for a period of two years. The contract also called for a payment of $5,000 to be made no later than June of 1996. At the end of a two-year period, the Kims were to pay the balance of the purchase price, presumably by refinancing the house.
 {¶ 5} The Kims made the $20,000 down payment, but they did not make the payment of $5,000 due by June of 1996. They lived in the house for 31 months, until August of 1998, but made only 29 monthly payments of $1,206.95. All payments were made to Zellmer. She paid $14,107.49 to Ashbury, which constituted the remainder of the $20,000 deposit after deduction of closing costs. During the first year the Kims lived in the house, 1996, Zellmer wrote checks for the amount of all the Kims' payments to Ashbury. However, pursuant to her request, Butler did not cash the checks for three payments from that year. In 1997, Zellmer sent two payments to Ashbury, and Butler did not cash the checks. Zellmer later stopped payment on these checks, which covered five payments, because she believed that she was owed money by Ashbury. Therefore, of the 29 payments made by the Kims to Zellmer, Ashbury received only eight payments. Zellmer retained the funds for a total of 21 of the payments.
 {¶ 6} Until sometime in 1997, Ashbury had been making monthly interest payments averaging $650 per month on the NBD loan. However, this ended in 1997, and Zellmer began making those payments. Thus, the trial court concluded that, of the $6,981.73 in payments from the Kims that Zellmer had retained by stopping payment on several checks, $3,250 was used for interest payments on the NBD loan and only $3,731 was retained by Zellmer. Of the $19,309 in payments that Zellmer did not pay to Ashbury at all, $10,400 was paid to NBD and only $8,909 was retained by Zellmer. Thus, Zellmer retained $12,640 of the payments made by the Kims. Butler permitted her to retain $6,500 of this amount to cover money owed to her on an unrelated matter.
 {¶ 7} Zellmer claimed that she had retained the payments made by the Kims because she was owed money by Ashbury for marketing work. Around the time that Zellmer procured the NBD loan, she and Ashbury entered a contract, drafted by Zellmer's attorney, which provided that Zellmer, as an independent contractor, would provide marketing services for the Ashbury subdivision and other properties developed by TAD Development for a period of three years. Pursuant to this contract, Zellmer was to earn a 2.5 percent commission on the gross sale price of properties sold in the subdivision. The agreement specified that Zellmer would receive a monthly draw of $1,000 toward that commission. However, she was to earn a minimum of $40,000 per year. She was to provide Ashbury with an accounting of commissions received at the end of each contract year so that Ashbury could pay her the difference between that amount and $40,000. It is undisputed that, during the three years of this contract, Ashbury never paid Zellmer the entire $40,000 per year to which she was entitled.
 {¶ 8} By the summer of 1998, it was apparent that the Kims were unable to obtain a loan to pay off the remaining amount owed on the house, $149,900. Zellmer meanwhile was unable to afford both the monthly payments on 1644 Wimbledon Drive and the payments on her own condo. She therefore sold her condo to the Kims, and that sale earned her $50,000 in cash. Zellmer then moved into 1644 Wimbledon Drive, which had been appraised at $170,000. She continued to make monthly interest payments on the NDB loan until November 1998 when she paid off the $67,165 balance on the loan with $27,000 in cash from the sale of her condo and a $40,000 loan from National City Bank. At the time this lawsuit was initiated, Zellmer was still living in the house and was not making any payments to Ashbury. Butler learned in April of 1999 that Zellmer was living in the house.
 {¶ 9} Ashbury filed a complaint against Zellmer on May 22, 2000 seeking $138,704 plus interest and requesting that Zellmer be declared a constructive trustee of the property. Zellmer filed an answer and counterclaim on July 25, 2000. In her counterclaim, Zellmer asserted that Ashbury owed her money for commissions pursuant to the marketing contract. A trial was held before a magistrate in the court of common pleas on June 14, 2001. A decision was issued on November 30, 2001, and the parties filed objections to that decision. On January 30, 2002, the trial court adopted the magistrate's decision, indicating that it had reviewed a transcript of the proceedings. Zellmer appealed, and we reversed, concluding that a transcript of the proceedings had not been filed until February 5, 2002, after the trial court's decision. On remand, the trial court again overruled the parties' objections and adopted the decision of the magistrate.
 {¶ 10} The trial court concluded that Zellmer owed Ashbury $102,835 plus interest, which represented the amount that the house had appraised for, $170,000, minus the amount Zellmer had paid on the NBD loan, $67,165; and $6,140 plus interest, which represented the amount of the retained benefit from the Kims' payments, $12,640, minus the $6,500 that Butler allowed Zellmer to retain for payment of an unrelated debt. The magistrate further concluded that Ashbury owed Zellmer $270 plus interest, which was the unreimbursed amount of the loan application fee for the NBD loan. Ashbury also owed Zellmer $65,413 plus interest, which represented the amount owed to Zellmer under the marketing contract; and $430.49 plus interest, which was the amount of unpaid reimbursable expenses under the marketing contract.
 {¶ 11} Zellmer appeals, raising five assignments of error, which we will consider in the order that best facilitates our discussion.
 {¶ 12} "I. The Lower Court Erred In Concluding Damages Against The Appellant Based Upon A Loan Appraisal Value Made In 1998 Of $170,000.00 Instead Of Utilizing The Sales Price Of $169,900.00 Agreed Upon By The Appellee In The Land Contract Sale To Mr. And Mrs. Kim Which Occurred In 1996."
 {¶ 13} Under her first assignment of error, Zellmer contends that the trial court erred in determining the amount she owed to Ashbury by reference to the appraisal amount of $170,000 rather than the sale price of $169,900. She argues that the parties' oral agreement was to terminate upon the sale of the property. The property was, in fact, sold to the Kims for the price of $169,900, and Ashbury agreed to this sale price. Therefore, according to Zellmer, this sale price should have been the starting point for any calculation regarding how much money she owed to Ashbury. Ashbury argues that Zellmer stipulated that $170,000 was a reasonable fair market value.
 {¶ 14} We agree with Zellmer's argument. The parties' oral agreement contemplated that Ashbury would receive the proceeds of the sale of the property. The property sold for $169,900, and all parties agreed to that sale amount. The oral agreement did not require that Ashbury receive the full appraisal value of the property or that Zellmer be responsible for any difference between the appraisal value and the sale price of the home. The fact that Zellmer stipulated that $170,000 was a reasonable fair market value is irrelevant. We do not doubt that the appraisal amount is a reasonable fair market value; however, pursuant to the parties' oral contract, Ashbury was entitled to receive the proceeds of the sale of the house, not the fair market value of the house.
 {¶ 15} The first assignment of error is sustained.
 {¶ 16} "II. The Lower Court Erred In Failing To Grant Credit To The Appellant For The $20,000.00 Down Payment Made By Mr. And Mrs. Kim Which Was Paid To The Appellees."
 {¶ 17} Under this assignment or error, Zellmer argues that the entire $20,000 down payment made by the Kims, encompassing both the $14,107.49 that was actually received by Ashbury and the $5,892.51 in closing costs, should have been subtracted from the amount Zellmer owed for the house. She argues that, because her oral agreement with Ashbury provided that it would bear all expenses associated with her procural of a loan and the sale of the house, it received the benefit of the $5,892.51 in closing costs as well as the $14,107.49 balance. However, Zellmer correctly notes that the trial court did not include the $20,000 down payment at all in its calculations.
 {¶ 18} We agree with Zellmer that Ashbury received the benefit of the entire $20,000 down payment made by the Kims. However, we do not agree that this figure was relevant to the trial court's calculations of damages. To determine what Zellmer owed for 1644 Wimbledon Drive, the trial court subtracted the amount of money that Zellmer had paid toward the house from the total value of the house (which we have determined supra should be the sale price of $169,900). Thus, the trial court subtracted the $67,165 that Zellmer had paid from her own funds toward the NBD loan on the property. The $20,000 down payment should not have been included in this calculation because it was not made by Zellmer. The payment was made by the Kims. It is uncontested that the Kims forfeited their down payment by their default of the land installment contract pursuant to R.C. 5313.05 and 5313.08, and Ashbury was entitled to that money pursuant to the oral agreement of the parties, which provided that Ashbury would receive all income or profit from the sale of the house. Therefore, this payment should not have operated to reduce the amount owed by Zellmer for the house.
 {¶ 19} Zellmer argues that, because the Kims paid her and she then paid Ashbury, she is in effect being required to pay the $20,000 twice. However, as stated above, the $20,000 down payment, although made to Zellmer, never belonged to Zellmer because the oral agreement specified that Ashbury was to receive the proceeds of any sale. Thus, Zellmer did not pay Ashbury out of her own funds; she merely forwarded the Kims' payment to Ashbury.
 {¶ 20} In short, Zellmer should not have received credit for the $20,000 down payment because it was not money paid out of her pocket. It merely passed through her hands on its way to Ashbury as required by the parties' oral agreement, which provided that all profits realized from the sale of the house would go to Ashbury. Had Zellmer not paid that amount to Ashbury, she would, in fact, have owed the amount of the down payment that she had retained, as was the case with the retained payments. Therefore, the trial court did not err in not crediting the amount of the down payment against the amount owed by Zellmer on the house.
 {¶ 21} The second assignment of error is overruled.
 {¶ 22} "III. The Lower Court Erred In Failing To Grant Appellant Credit For That Portion Of The Payments Made By Mr. And Mrs. Kim Which Were Received By The Appellees And Not Repaid In Construction Loan Interest."
 {¶ 23} Under this assignment of error, Zellmer argues that the trial court erred in not crediting her for the amount of the Kims' payments that she had paid to Ashbury. This argument fails for the same reasons as the argument made under the second assignment of error. Zellmer was required by the oral agreement to forward the Kims' payments to Ashbury. Therefore, she is not entitled to credit for the amount of the checks that she appropriately forwarded. She was credited for the amount that was received by Ashbury only in the sense that she does not now owe Ashbury that amount as in the case of the retained payments.
 {¶ 24} The third assignment of error is overruled.
 {¶ 25} "V. The Lower Court Erred In Concluding That The 1996 Sales By Appellant Included The Sales Identified As `Wisecup' And `R M Lot(s) . . . 5."
 {¶ 26} This assignment of error relates to the marketing contract between Zellmer and Ashbury. Pursuant to that contract, which was in effect for 1994, 1995, and 1996, Zellmer was to receive 2.5 percent in commissions on houses sold in the subdivision and a $1,000 monthly draw. However, her annual compensation was to be at least $40,000. At the end of each year, Zellmer was to provide Ashbury with an accounting of the commissions received by her under the contract, and Ashbury was to pay her the difference between that amount and $40,000. Ashbury did not pay her that difference in any of the three contract years. Under this assignment of error, Zellmer argues that the trial court erred in calculating the amount of commissions that Ashbury had paid to her in 1996 for the purpose of determining the amount of compensation still owed. Specifically, Zellmer contends that the trial court erred in including the commissions she received on two properties in 1997 in the amount of total commissions she received in 1996. It is undisputed that Zellmer did not receive the commissions on two properties, known as "Wisecup" and "RM 5" until mid-1997. She contends that, because she did not receive these commissions in 1996, they should not be included in her 1996 commissions.
 {¶ 27} Although Zellmer did not receive the commission until 1997, the Wisecup property was sold in November of 1996. Therefore, she was owed a 2.5 percent commission for that property in 1996 at the time it was sold. The fact that she did not receive that commission until 1997 does not negate that she was entitled to it in 1996. Therefore, we believe that the commission Zellmer received for the sale of the Wisecup property should be included in her 1996 commissions.
 {¶ 28} The property referred to as RM 5 is more problematic. We are unable to determine from the record when that property was sold, although the commission was not paid until July of 1997, two months after the commission for the Wisecup property was paid. Therefore, the trial court must determine on remand when the RM 5 property was sold. If it was sold in 1996, then that commission should be included in the total of Zellmer's 1996 commissions. If it was sold in 1997, then it was not subject to the marketing contract at issue in this case, and it should not be included in the amount of commissions received by Zellmer in 1996.
 {¶ 29} The fifth assignment of error is overruled in part and sustained in part.
 {¶ 30} "IV. The Basic Premise Of This Assignment Of Error Is Simply One Of Arithmetic. Appellant Contends That The Magistrate Did Not Correctly Add The Amounts Paid To The Appellant In The Conclusions Expressed In Finding Of Fact 52 Based Upon The Conclusions Expressed In Finding Of Fact 53."
 {¶ 31} Under this assignment of error, Zellmer argues that the trial court erred in calculating the amount owed to her by Ashbury pursuant to the marketing contract. In particular, she argues that the trial court erred in calculating the commissions she had been paid in 1995 and 1996. Ashbury does not address these alleged mathematical errors in its brief, arguing instead that the trial court should have used a different set of figures. This argument is also the basis of Ashbury's cross-appeal, and we will discuss it infra. However, it appears from our review of the record that the trial court did, in fact, make mathematical errors in adding the amount of commissions that Zellmer had received in 1995 and 1996.
 {¶ 32} In its findings of fact, the trial court listed the 1995 sales upon which Zellmer had earned a commission. It concluded that those commissions, together with total monthly draws from 1995 of $2,000, totaled $22,185 and that Zellmer was therefore entitled to $17,815 in additional compensation for 1995. Zellmer argues that the trial court erred in its addition and that the actual amount of the 1995 commissions was $20,685.43. Adding up the undisputed amounts of the 1995 commissions, we agree that the trial court erred in its addition; however, Zellmer has also made an error in her proposed figure on appeal. The actual amount of the 1995 commissions should be $20,655.43.[2]
Subtracting this amount from the guaranteed compensation of $40,000, Zellmer is entitled to $19,344.57 in compensation from 1995.
 {¶ 33} The trial court also appears to have erred in adding up the figures from 1996. The trial court reached a total amount of commissions for 1996 of $16,201. However, adding up the commissions that the trial court determined Zellmer had received in 1996 does not result in total commissions of $16,201. At most, the amounts add up to $11,298. This takes into account that there are discrepancies in the documents regarding the amount of the commission paid for the Wisecup property, but that Zellmer has conceded that the higher amount of $3,552 should be used for this appeal. This amount also includes the commission paid on the sale of the RM 5 property, which may or may not be included pursuant to our discussion under the fifth assignment of error, supra.[3] However, at most, the amounts that the trial court stated were to be included in Zellmer's 1996 commissions add up to $11,298, which would result in Zellmer's being owed $28,702 in compensation for 1996. It is unclear how the trial court reached the $16,201 figure.
 {¶ 34} The fourth assignment of error is sustained.
 {¶ 35} In its cross-appeal, Ashbury raises one assignment of error.
 {¶ 36} "Whether The Trial Court Erred By Not Accepting Appellant's Calculations Of Commissions Due From Appellee."
 {¶ 37} Ashbury argues that the trial court erred by utilizing a calculation of commissions paid to Zellmer made after this lawsuit was initiated rather than calculations made at the time that Zellmer sought compensation in 1997. Essentially, in 1997, Zellmer prepared statements of commissions paid to her that included commissions paid on properties in the subdivision, commissions paid on other "David Butler-related properties" (presumably other properties developed by TAD Development), and commissions paid on other unrelated properties. In 2000, during the pendency of this case, Zellmer prepared a new statement including only commissions paid for properties in the Ashbury subdivision and other properties developed by TAD Development. The trial court used this latter calculation, concluding that there was "no basis to vary the clear and express provisions of the Compensation Section of the Contract to include commissions that Rose Zellmer may have earned as an independent contractor and realtor for the sale of properties at locations other than Ashbury Hill." The trial court went on to conclude that it would also include the TAD Development properties that Zellmer had included in her 2000 list of commissions.
 {¶ 38} We see no error in the trial court's decision. The fact that Zellmer had prepared other statements of commissions paid at an earlier date does not mean that those tallies were correct or that they listed the commissions contemplated in the contract. The contract provided that, "Notwithstanding sales of the properties, ZELLMER shall receive an annual compensation under the terms of this contract in an amount not less than Forty Thousand Dollars." The terms of the contract provided that Zellmer was to provide marketing services for the Ashbury Hill subdivision and other TAD Development projects. We see no ambiguity in the contract provisions and believe that the trial court correctly utilized the later calculations. This is not a matter of credibility. The only issue is what amounts should be included pursuant to the contract. We see no justification in the language of the contract to include commissions that Zellmer received for properties not developed by either Ashbury or TAD Development. The fact that, as Ashbury argues, Zellmer would have accepted less money in payment of the compensation owed her in 1997 does not mean that the earlier figure was correct or that Zellmer should be held to that figure. It simply means that, had Ashbury paid Zellmer when the money was due and before Zellmer had an opportunity to review her calculations, it likely would have been able to pay less.
 {¶ 39} Ashbury's assignment of error is overruled.
 {¶ 40} The judgment of the trial court will be affirmed in part and reversed in part, and this matter will be remanded for further proceedings consistent with this opinion.
FAIN, P.J. and BROGAN, J., concur.
[1] For the purposes of this opinion, Ashbury Development and Realty Investments will be referred to collectively as "Ashbury." TAD Development is not a party to this action and will be referred to separately throughout this opinion.
[2] Zellmer's error was made in adding the amount of her commission for the sale of 1638 Wimbledon. Exhibits FF, HH, and II listed the amount as $1,966.56, which is reflected in Zellmer's table; however, in listing the amount in the "Undisputed Values" column, Zellmer mistakenly entered $1,996.56.
[3] Without the inclusion of the RM 5 property, the amount of the 1996 commissions would be $10,092. Under this scenario, Zellmer would be owed $29,908 in commission from 1996.